### 33864. TYNER & BLACKMON *v.* FRYER TRUCK & TRACTOR CO.

DECIDED MARCH 7, 1952.

*Kennedy & Bullock,* for plaintiffs.

*Swift, Pease, Davidson & Chapman,* for defendants.

SUTTON, C. J. This case was previously before this court on exceptions to the overruling of a motion for a new trial, which assigned error on the direction of a verdict for the defendants, and this court reversed the judgment of the trial court. *Tyner & Blackmon* v. *Fryer Truck &c. Co.,* 83 *Ga. App.* 393 (63 S. .E. 2d, 695). The material allegations of the petition and the evidence on the first trial of the case are set out in that decision.

On the second trial of the case, Bruce Gilbert testified for the plaintiffs, in part, as follows: "On December 3, 1948, I was employed by Tyner & Blackmon Funeral Home [the plaintiffs], Manchester, Georgia. On that day, I had occasion to take the funeral car of Tyner & Blackmon to Fryer Truck and Tractor Company's [the defendants'] shop for repair, . . to have the mechanic work on it. Couldn't get the ambulance to make over 30 or 40 miles. Mr. Tyner ordered me to take it to the garage and have it repaired, have work done on the ambulance. So early next morning, I carried it up there and turned it over to the mechanic, or the foreman. He took it and worked on the carburetor and checked the timer. He took about fifteen minutes working on it. While he was doing that work he had me to get in and crank up the ambulance and then got back out while he was adjusting the carburetor. He done that two or three different times. When he completed that work, he asked me to get in and drive the car. He got in and asked me to drive the car while he listened to the carburetor. So I cranked up the ambulance. He told me which direction to go. He got in on the other side and says, 'Go out the Warm Springs highway.' We come out around by Ousley's and he had me to speed up. He asked me to speed up the second time, and just after that he mentioned something about going down by Bussey's crossroads. We proceeded. We come by Tew's. It was raining at the time and the pavement was wet. The ambulance went to the right to a bank. He made some remark about it. Says, 'Oh.' Then the car went to the left and went back to the right on that side, and went back and left and turned over a couple of times. He

gave me every instruction what to do with the ambulance. He told me to speed up and I speeded up the second time. He gave me orders to speed up again and I speeded up again. Edwards [the defendants' mechanic] was in the car. He was in this position (indicating) listening, leaning over and listening at the motor. At the time I started out the Warm Springs road or highway, it was raining and the road was wet. . . I had been driving that ambulance ever since I started to work for Tyner and Blackmon, the first of February that year, 1948. I was the regular driver because I was employed regularly at the time because L. B. Tyner was in school. I had the authority to drive it at that time. I had the authority as Mr. Edwards ordered me to do. He was the foreman. I was employed to run it up to the garage and then Mr. Edwards taken charge of it. I did under Mr. Edwards' orders. I had the authority he gave me. I was driving at that particular instance under his orders. I had it in my charge at that time when I brought it there. I took the ambulance to the garage. I requested that the work be done. I drove the ambulance out there and asked the work to be done on the car. I did because Mr. Tyner ordered me to. I was driving the ambulance at the time it was turned over. I drove the car from the garage after the work had been done because Mr. Edwards told me to. I was there watching and assisting in the repair work simply because Mr. Edwards asked me to. Because Mr. Edwards told me to do it, I was simply assisting him in the work. I was assisting him in the work, doing the repairs, and then I went out on the road because he asked me. At any time I was driving under his instructions I would do all I could to carry out his orders. If I couldn't do it I would have let him do it. . . I did not notice the speedometer. I couldn't estimate the speed. . . I know it was gaining speed. I do not know how much. It picked up on this occasion. It speeded up. I took it to the garage because it wouldn't pick up. I took it there to make it speed up."

M. E. Blackmon, one of the plaintiffs, testified that Gilbert was in his employ on December 3, 1948, and also as to the plaintiffs' damages.

Cecil Edwards testified in part as follows: "On the 3rd day of December, 1948, I was employed by Fryer Truck and Tractor

Company. I recall doing some repair work on a funeral car of Tyner and Blackmon. It took me about fifteen minutes to make the repairs. I adjusted the carburetor and the timer. Mr. Gilbert asked me to do that work. There was no charges whatsoever made for the work. Bruce Gilbert, during the time, was in the shop and around the car. When I finished the job, got through with it, I laid my head down on the car and Mr. Gilbert got under the wheel. I told him it was finished. He suggested that we take a ride. So I got in on the opposite side and he drove out the Warm Springs road along about the bridge at a fast rate of speed, going about fifty-five miles an hour. I tried to get him to turn around at Tew's store. He laughed and told me he had as soon go one hundred miles as seventy-five. I told him it meant lots to me. He went over the left side and turned head end come over a bank. Bruce Gilbert asked me to get in the car and ride. I had concluded my adjustment. I know how fast he was going just immediately before he turned over. It was going around fifty-five miles an hour. . . The job was finished. There was not anything further to be done by me on that car. My job was completed at the garage. Mr. Gilbert asked me to go, said he wanted to give the car a try-out. I did not tell him at any time what speed to make. I did not select the highway upon which the ambulance was to be driven. I did not give him any instructions at any time as to where he should go. I asked him to turn around at Tew's store; I had some customers and had to get back to the shop. When I made that request, he did not comply with it. He continued to go right ahead. He was going left to right. He passed a truck and run around it. He met a truck and run off the pavement. . . If I were going to make a test, I would have driven myself. When I completed the work I turned the car over to Mr. Gilbert. I do not make out a bill when I do the work. I had to wait until the work is priced. Mr. Fryer fixes the charges if there is going to be any charge. I make out the job. I never charge regular customers for carburetor adjustment. Mr. Fryer does the charging. Mr. Gilbert said he wanted me to check the carburetor. I worked on that car not over fifteen minutes. Then I made a trip on this road of fifteen minutes at his request. The charge for labor depends on the work we have to do and what and where

it is. Mr. Fryer charges $2.50 an hour. . . He was under the wheel when I closed the door. . . I told him he was ready to go. I had completed the work. Ordinarily when I complete the repairs, I tell the man the number of hours I made. The charge depends on the number of hours. When I completed the work, if there had been any charges, I would have made out a bill. If I hadn't completed it, I would have driven myself."

R. C. Fryer, one of the defendants, testified that Edwards had authority to make simple adjustments of carburetors for customers. "It is free to my customers. When I sell a new car, I usually service the repairs for any trouble and the mechanic has the authority to make these adjustments without charge. Mr. Blackmon did not buy this funeral car from me. He, Mr. Edwards, had no authority to employ others."

The jury returned a verdict for the defendants, and the plaintiffs' motion for a new trial was overruled, to which judgment they except.

1. Ground 1 of the amended motion for a new trial complains of the following charge of the court to the jury: "Now, gentlemen, I charge you, that the relationship of bailor and bailee does not exist until there is such a delivery of the property that the alleged bailee acquires an independent and temporarily exclusive possession thereof and unless there is an actual change of legal, as well as physical possession of the property from the bailor to the bailee, by virtue of which the bailee is entitled to maintain an action of trover or trespass against one who interferes with his possession, or who negligently destroys the property while in his possession of the property." It is contended by the movants that this charge was not adjusted to the evidence and was confusing to the jury, in that the charge rendered the existence of the relationship of bailor and bailee dependent upon whether the bailee could maintain an action of trover or trespass, without further charging the jury as to the principles authorizing a bailee to maintain such actions; and that the charge was not adjusted to the issues made by the evidence, in that the defendants' evidence showed that the car had been bailed, and the only issue presented by the evidence was whether the bailment had been terminated at the time of the wreck, as the relationship of bailor and bailee commenced when the work began; and that the court

failed to charge what constituted legal, as distinguished from physical, possession of the property in a manner understandable to the jury.

The trial judge, after stating to the jury the contentions of the parties as contained in the pleadings and after giving the formal parts of his charge, instructed the jury that a bailment is the delivery of goods or property for the execution of a special object, beneficial either to the bailor or bailee or both, and upon a contract, express or implied, to carry out this object and dispose of the property in conformity with the purpose of the trust. This is the definition of a bailment as contained in Code § 12-101. He then instructed the jury that a bailee is required to exercise care and diligence in protecting and keeping safely the thing bailed, and that the defendants in this case were required to exercise ordinary care and diligence in protecting the property of the plaintiffs until the bailment ended. He charged the jury that, if the loss and damage to the plaintiffs' car occurred while it was bailed to the defendants for the purpose of making repairs, then the burden was on the defendants to show that they had exercised ordinary care in protecting the property of the plaintiffs; that, if the car was still bailed to the defendants for repairs and if the defendants' agent or employee was negligent in the instructions that he gave to the driver of the car, the fact that the driver of the funeral car was the agent and employee of the plaintiffs for the purpose of taking the car to the defendants', garage for repairs would not prevent such driver from acting for the defendants and would not prevent the plaintiffs from recovering; and that, if the jury found that the trip resulting in the damage to the car was for the purpose of making repairs, which the defendants had been employed to do, then the jury would be authorized to find that the contract of bailment had not been terminated and that the defendants were bound to protect the property thus placed in their hands for repairs. His entire charge was predicated on the assumption that a bailment of the car in question at one time existed between the plaintiffs and the defendants.

In the paragraph of the judge's charge next preceding the portion of the charge excepted to in special ground 1 of the motion, the jury was instructed as follows: "The defendant in this case

insists that the bailment had ended, that the car had been turned over to Gilbert, the man who brought the car to the garage, and that Gilbert drove the car away from the place of business and requested the mechanic of the defendants to go with him, and the car was operated by Gilbert, under Gilbert's direction, the agent, servant, and employee of the plaintiffs."

In special ground 2 of the motion, error is assigned on the following charge to the jury: "If you find, from the evidence in this case, that, at the time this car was turned over, it was owned by the plaintiff and was being driven by the plaintiff's agent who was authorized to drive it at said time and place, you may infer that Bruce Gilbert was driving it within the scope of his employment, and the burden of proof would be on the plaintiff to show the contrary." It is contended that the charge was not adjusted to or authorized by the evidence in the case and placed an unauthorized burden of proof on the plaintiffs.

Special ground 3 complains of the following charge: "I charge you, gentlemen, that if you find, from the evidence in this case, that Bruce Gilbert was driving in a negligent manner, and such negligence, if you find Bruce Gilbert was negligent, was the sole and proximate cause of the turn-over of the car, then, gentlemen, your verdict should be for the defendant." The movants contend that this charge was not sound as an abstract principle of law, and was not adjusted to the issues made by the pleadings and the ·evidence.

The issue in the case as raised by the evidence was whether or not at the time the car was wrecked the repairs had been completed and it was being tried out at the instance of Gilbert, the agent and employee of the plaintiffs, or whether the repairs had not been completed and the car was being operated by Gilbert under the direction of Edwards, the defendants' employee and agent. In other words, the controlling issue was whether or not the bailment had ended at the time the car was wrecked. The evidence with respect to this issue was in sharp conflict. We have read and considered the entire charge of the court, and we are of the opinion that the charge excepted to in ground 1 of the motion was not error for any reason assigned; nor were the charges excepted to in grounds 2 and 3 of the motion error for any reason there assigned.

2. The general grounds of the motion for a new trial are neither argued nor insisted upon in the brief of the movants. There being no error shown by the special grounds, the trial judge did not err in overruling the plaintiffs' motion for a new trial.

*Judgment affirmed. Felton and Worrill, JJ., concur.*